judge Tucker.
In this case, which has occupied six days of a former term in the argument, a great variety of points have been discussed.
Robert Brown Jameson, and Samuel Montgomery Broxvn, in April, 1795, sued out a subpoena in chancery from the county court of Fairfax, against the appellant Jiadfeld, Josiah Watson, and Jonah Thompson, on which the following endorsement appears to have been made by the complainants’ attorney: “ Memorandum, to stay the effects and debts in the hands of the defendants, Josiah and Jonah, belonging and due to the defendant Joseph, to satisfy a debt due from him to the complainants.” And it has been objected, (and I think on good grounds,) that this endorsement, not made by order of court, or by an officer thereof, but by the complainants’ attorney, could not operate as an attachment, under the act of assembly,(a) to stay the effects of one of the de- - 7 J J fondants in the hands of any other.(1) The case Williams v. Williams(b) furnishes the principle upon which I found my opinion. In that case the bank of England was made a party defendant; and the counsel for the plaintiff said that, in practice, the subpeena being served, operated upon the bank as an injunction, and prevented a transfer; which they never would permit altor service of the subpoena. But the master of the rolls replied, that although this was so in practice, it was not so in lav/; as a subpeena served would not be an answer to an action for not permitting a transfer, though an injunction would. The reason appears to me to be the same in the case of an attachment against the effects of a defendant in foreign parts. I mention this for the sake *56 of the practice; for in the present case the defendants appeared and answered; which removes any objection to the process, on their parts. Mr. Warden contendedi that none but citizens of Virginia were entitled to the benefit of this course of proceeding against absent debtors, or defendants. The fourth article of the constitution of the United States, providing that the citizens of each state shall be entitled to ^tll the privileges of citizens of the several states, furnishes a complete answer, so far as relates to citizens of the United States.
The subpoena having been returned executed on Josiah Watson and Jonah Thompson,■ at a court held for the' same county on the 18th of June, 1793, “ came the complainants, by their attorney; and thereupon Jonah Thompson in open court became security that the defendant, Joseph Hadfield, shall perform the decree of the court, if against him; and, on the motion of the said defendant, Joseph Hadfield, by his attorney, the attachment is discharged, as to the effects in the hands of the other defendants.” At this time there was no bill filed, the bill ■appearing to be filed at the September rules thereafter. And, on the same day of filing the bill, an attachment for failing to answer the complainants’ bill was ordered against all the defendants, which issued and bears date the 29th of the same month. Here let it be observed that the county court act(a) allows a defendant until the next rules, after his appearance, and bill filed, to put in his answer. The attachment was therefore prematurely awarded. The attachment being returned not executed on Hadfield; on the 22d of March, 1796, at a court held for the same county, came the complainants, by their attorney, when the following suggestion appears upon the record. “ The defendant, Joseph Hadfield, not having entered his appearance, and given security according to the act of assembly, and the rules of this court, and it appearing to the satisfaction of the court that he is not an inhabitant of this country, an order of publication is awarded against him, and an order to stay his effects, in *57 the hands of the other defendants” is made ; as if nothing had been done at the former court, held in June. The record of which is thus expressly contradicted by this suggestion on the part of the complainants.
Here let it be observed, that after Hud field had appeared and given security, as required by the act of assembly, the cause ought to have proceeded as if the subpoena against him had in the first instance been returned executed» Consequently, the order of publication against him as an absent defendant, and the order for staying his effects in the hands of the other defendants, (after lie had given security to perform the decree,) was irregular and erroneous. The complainants, after the time allowed by law for him to put in his answer, might have taken out an attachment for want of answer, and if it had not been executed, an attachment with proclamations might have issued; upon the return of which, if no answer were put in, the bill might have been taken for confessed, and the jnatter thereof decreed.
At the March rules, 1796, which was, consequently, posterior to the last-mentioned order made in court, it was ordered that an attachment with proclamations be issued against Hadji eld. But the clerk certifies that the said attachment does not appear among the papers in the cause. Neither does the order of publication appear to have been actually complied with. The cause was continued from time to time, at the rules, until the 18th of July, 1797, when, the defendants having failed to file their answer, it was ordered that the complainants’ bill be taken for confessed.
The cause was set for hearing in March, 1799, and was heard in June following; when an interlocutory decree was entered, by the terms of which, the complainants, within a limited time, were to give bond and security for repayment of the money decreed them, in case the said Joseph Hadjidd should, within seven years, put *58 in his answer, and make it appear that he is entitled to restoration.
Thompson having appeared and put in his answer, on the 19lh of November, 1799, a final decree (in which it is suggested “ that it having appeared to the satisfaction of the court, that the complainants’ bill hath been duly taken for confessed”) was entered. How, or when it had been made so to appear to the court, is not to be discovered from the face of the record.
From this abstract of the proceedings in the county court, the first question which presents itself is, whether the cause was ripe for a hearing and decree against the defendant Hadfield.
Hadfield having appeared in court by his attorney, and given the security required by law, the proceedings against him as an absent defendant were wholly at an end : every thing done against him thereafter in that character was erroneous: if the order of publication had been duly published and returned, (that not being the proper. course which the law prescribes in such a case,) if would not have justified a decree. But if it had been the proper course, not having been actually published, the court ought not to have proceeded to pronounce a decree, as was decided in the case of Hunter v. Spottswood.(a)
' On the other hand, the attachment (for want of an answer) ordered on the very day the bill was filed, was an irregularity which, possibly, runs through the subsequent proceedings; but, whether it doth or not, the attachment with proclamations, afterwards awarded, having never issued or been executed, (as far as appears from the record,) the bill against Hadfield ought not to have been taken for confessed upon that ground.
Independent of these objections, the decree appears to be erroneous in another respect. Hadfield having appeared and given security to perform the decree, the attachment was discharged (as already noticed) as to his *59 effects in the hands of Watson and Thompson ; notwithstanding which, the sum of 498/. 15s. 3d. sterling, alleged to be due from Thompson to him, is decreed to be paid by Thompson as his debtor; whereas, no decree (after security given, and the attachment discharged) ought to have been made as to any money he might have in Thompson''s hands; the decree ought to have been against Hadfield alone ; if he did not perform it, then the complainant, and not till then, was entitled to call upon the security for the performance of it, or damages for non-performance.
The decree of the county court was, therefore, clearly erroneous, and ought to have been reversed by the chancellor.
I shall now proceed to examine the proceedings in the superior court of chancery; first, with a view to the regularity and correctness of the same.
On a petition of appeal being presented to the chancellor of the Richmond district, the same was allowed, December 19, 1802, upon terms (as I understand the record) that the petitioner Hadfield should consent to answer the bill within four months, and also consent, at the term approaching, to a reference of the accounts between the parties. In June, 1803, the order of reference was made in court, by consent of parties. In page 74. of the record we find the answer of Joseph Hadfield, by James Barry, liis agent, to a bill exhibited against him and others, in the county court of Fairfax, which appears to have been sworn to by Barry, September la, 1802; not only after the final decree in the county court, but after the petition of appeal, which was first conditionally allowed by the chancellor on the 12th of April, 1802. And the very next entry in the record is, that at rules held in the office of the said court, (the superior court of chancery, I presume, as the cause was then removed thither,) in the month of March, 1003, Robert Brown Jameson Co. hv counsel, replied, generally, to the foregoing answer *60 of Joseph lladfeld,, by James Barry, his agent; and commissions were awarded the parties to take depositions-; and, at rules held in February, 1804, the cause was set for hearing, on the motion of Hadfield by counsel. “ And at a superior court of chancery held at the capital, March 7, 1804, 'this cause, on appeal from a decree of the county court of Fairfax, was heard last term, on the transcript of the record of the county court, and on master commissioner Keith's report, in pursuance of this court’s order, with the objections stated, and documents and exhibits mentioned therein, &c. On consideration whereof, the court pronounced the decree of the county court to be correct, and affirmed the same, with costs against the appellant.”
I conceive it to be an undeniable principle, that whenever a cause is brought before a superior court by an appeal, that court is to proceed to consider the cause as the record of the court (whose judgment or decree is sought to be reversed) presents the same for consideration; and to affirm or revei'se the same accordingly, previous to any steps whatsoever to be'taken in the appellate court, as if the suit had been originally commenced therein. That the chancellor, after reversing the decree of an inferior court, has a right to retain the cause, and thereafter proceed therein as if it were an original suit, is unquestionable from the authority of this court in Ambler v. Wyld.(a) But it would lead to the most mischievous consequences, if an appellate court at common law, or in chancery, antecedent to pronouncing a judgment or decree of affirmance, in cases of appeal, were to admit proceedings to be had, which might cure the errors of the inferior court, committed at the time of pronouncing the original decree. In the present case, according to my view of it, the proceedings and decree of the county court were palpably erroneous, upon whatéver ground the same may be examined, according to the record in that court. The party grieved by thát de *61 cree was compelled to give security in 15,000 dollars before he could obtain his petition of appeal to be allowed. His security probably consulted counsel whether he could be brought in danger of losing so large a sum, by the affirmance of the decree, upon the proceedings had in the county court, lie might have been advised (and well advised) that there could be no danger that the decree would be affirmed. What, then, is his situation, if other evidence and other proceedings be had in the appellate court, to cure the errors below, and furnish a ground for an affirmance í The case speaks too plainly for itself to require any further comment. I have therefore no doubt, upon this point, that the chancellor’s decree, affirming the decree of the county court, is erroneous, and ought to be so far reversed.
We are now to consider the cause upon the merits, so far as the evidence before us will permit us to decide upon them.
Samuel Montgomery Brown., one of the original complainants in this suit, a partner in a mercantile house, with the other complainant, (now survivor,) Robert Brown Jameson, and, with that partner, a part owner of the ship Favourite, an American ship, and master of the ship, and agent for the owners of the ship generally, entered into a charter-party for the ship, in England, with the defendant Iladfield, in behalf of two French gentlemen, to proceed from England to Philadelphia, to take in a cargo of flour on account of Hadfield; from thence to Port-au-Prince to take in a cargo of sugar, and from thence to proceed to Falmouth, where she is to be subject to the order of Iladfield, and proceed to a market, provided it be without the straits and the Baltic, and to a port where there is a sufficiency of water for the ship to lay in safety; with the usual covenants as to seaworthiness, kc.: and, in consideration of the aforesaid agreement, £e ou the part of Samuel Montgomery Brown, in behalf of the owners, 'Iladfield, in behalf of the other parties, covenanted to deliver the cargoes alongside the *62 ship,” and “ to pay or cause to be paid to the order of Samuel M. Brown, in behalf of the owners, monthly, if required, and for every month during the time the ship shall be employed in the prosecution of the voyage therein before mentioned, and until she is finally discharged at the port of discharge, freight at a certain rate: and that, although the ship may be detained by embargo, or restraint of princes or states, the freight shall be paid, as if no such detention had happened. And the parties bind themselves to the performance of the preceding covenants, their executors, administrators and assigns“ that is to say, the said Samuel M. Brown, in .behalf of the owners of the ship and her apparel, to the aífreighter; and Joseph Hadfield, in behalf of the French gentlemen, and the respective cargoes, to the owners.” The ship proceeded to Philadelphia; and from thence, with a cargo of flour, to Port-au-Prince. An insurance having been ordered by the owners, Hadfield, on the 2d of August, 1793, writes M. Brown thus: “ I have insured the Favourite, and cargo, to all ports and places for one year, at 15 guineas per cent, therefore, make yourself easy.”
In a succeeding letter to S. M. Brown, October 2, 1793, he says, “ I trust yon will have sent the proceeds of the Favourite’s adventure to New-York or Baltimore, or perhaps to Europe; in any case rather than to the house of Clough & Co.” From this letter it would appear that the proceeds of the flour were not to be applied to the purchase of the sugars, which were to constitute the return cargo of the Favourite from Port-auPrince to Falmouth.
Several other extracts of letters from Hadfield to S. M. Brown, in the record of the county court mentioned as exhibits annexed to the bill, show an unlimited confidence to have been placed by Hadfield in Brown. In a letter, annexed to commissioner Keith’s report, March 11, 1793, he says, “ I wish you would buy Mr. Watson’s *63 share, and hold it for my account, by which you will have the disposal of the ship Favourite entirely.” And the remaining letters annexed to that report, (none of which are later than the 2d of October, 1793,) express the same sentiments of unlimited confidence in Broten. An extract of a letter dated London, November 15, 1793, in which Iladfield mentions that he had heard of Brown’s arrival at Port-au-Prince, “ and of his unfortunate prospects,” with a trust in his friendship and exertions, appears to conclude the correspondence between them.
The hill which was filed in the county court, and to which no subsequent amendment was made, charges, as the ground of the complainants’ demand against Hadji eld, “ that he stands justly indebted to them in ¿he sura of 860/. 12s. Id. sterling, as will appear by the accounts thereto annexed,” (accounts not rendered to them by Iladfield, but stated by themselves against him, and, therefore, requiring proof in support of every article,) “ and also by the charter-party, and letters above noticed, which are particularly referred to, and prayed to be made a part of the bill.” By what evidence the items of freight, amounting to 2,843/. Is. Id. and insurance, to 3,200/. sterling, were proved, or established before the county Court, nowhere appears from the record. The deposition of Josiah Watson, taken before the commissioner, states that, to the best of his recollection, the ship was directed to be insured at 2,200/. sterling: and, James Lawrason swears that he knew the ship, and that he considers her to have been worth 3,000/. Virginia currency. Watson likewise deposes, that the Favourite did proceed upon her voyage, pursuant to the charter-party, and arrived at Port-au-Prince, where she was seized by the government and condemned, about the 17th oi July, 1794; that he was a part owner of the ship, and, in the settlement of accounts between himself and Iladfield,Li with his agent in this country, his part of the freight from London to Port-au-Prince was never con *64 troverted, but was agreed to be allowed that Benjumin Moody was captain of the Favourite at Port-au-Princer and, he believes, that he went out as such from Philadelphia. A certificate from an insurance broker at Baltimore, states, that policies to the amount of 2,812/. 10?. Maryland currency, made on the ship Favourite for six months, and another for 937/. 10?. like money, for the like period, from June 21,1793, had been cancelled, on satisfactory prooí that an insurance had been effected in England.
If the chancellor, disregarding the answer of Hadfield, which I shall notice hereafter, proceeded to pronounce his decree from the evidence arising out of these depositions, which must be regarded as the basis of the commissioner’s report, predicated upon the liability'' of Had-field., both for freight, pro rata, and insurance, I think the evidence insufficient; because the Favourite being an American ship,-and in the port of a friend and iat that time) an ally of the government, under whose authority it is stated that she was seized and condemned, the presumption was, that she was lawfully seized and lavjfullij condemned. At least no presumption to the contrary could be admitted under such circumstances. The chancellor, therefore, ought to have suspended pronouncing any decree until further proof, as to this point. It mattered not whether Brown, or Moody, or any other person, was master of the ship at the time of the seizure and condemnation. If the master be not a part owner of the ship, he is the confidential servant and agent of the owners at large ; if a part owner, he is so of his co-partners.(a) There is no case in law, in which the max- . . . xm respondeat superior more generally holds, than between the freighters and the owners of ships, in respect to the conduct of the master. For if any injury or loss happen to the ship or cai’go, by reason of his negligence, or misconduct, the merchant may elect to sue him, or the owners, to make good the damages,(b) If the naked *65 Tact of a seizure and condemnation of a ship, In’ the 1 - government, in the port of a friend and ally, could furnish any ground for a presumption, it was a presumption unfavourable to the master and his employers. And if Brown be presumed to have been the cause of the seizure, as the agent of Hadfleld, his delinquency must have been at least equal in his character of part owner of the ship. And it would be a new doctrine to me for a court of equity to establish, that he who hath occasioned a loss, both to another and himself, shall be recompensed by the other, for the loss to himself, occasioned by his own default or misconduct.
But if the case be considered as standing in any way connected with HadfieWs answer ; (which, I have already noticed, was filed at the rules, in the superior court of chancery, without any exception taken thereto, and replied to generally; which put the matter contained in the answer in issue between the parties ; commissions to take depositions being at the same time awarded, though none were taken;) the matter contained in the answer, if true, amounted, in my apprehension, to a full and complete defence ; for it charges the loss of the ship, and of the defendant’s property on board the same, to the misconduct of Samuel M. Brown, one of the complainants in the bill, and one of the part owners of the ship, then upon the spot. The documents annexed to the answer, if they did not amount to full and complete proof of the matters therein alleged, for want of due solemnities in the authentication thereof, at least furnished strong presumption in favour of the verity of the answer. The deposition of Josiah Watson, the complainants’ own witness, went to corroborate this presumption ; and the silence of Samuel M. Brown, to whose fraud and misconduct the loss of the ship, and cargo, are positively and expressly imputed, gives to these presumptions a strength little short of what is *66 deemed in law full proof. If, under this view of the proceedings in the cause, and the evidence and presumptions, authorized by these circumstances, united, the cause was ripe for a decree, I should draw a conclusion very different from that of the chancellor, in his decree, Robert B. Jameson, and Samuel M. Brown, the original complainants in this suit, were general partners in trade, a consequence of which is, that they are to take share in the profits, and bear a proportion of the loss, sustained by them in the course of their partnership dealings. Where an individual deals with partners in trade, he goes upon the credit of the whole, considering the act of one, in a joint concern, as the act of the wole copartnership firm, throughout the ordinary course of general trade.(a) And the law is positive with respect even to secret partners, that, when discovered, they shall be lia-' ble to the whole extent.(b) If one partner be guilty of trading on the joint account in contraband goods, or in any manner prohibited by law, the rest of the partners must be considered, more or less, implicated in the transaction, (c) And a secret partner, (though a clergyman, who is prohibited from trading, by act of parliament, under a penalty,) has been held liable to become a bankrupt, in respect to the partnership concern.(d) And where there are joint partners in any trade or business, (the books are kept in the name of the whole, and the stock being joint,) it is understood by merchants, that, in every occurrence between the partnership and third persons, the company is considered as a single person j therefore the mode of traffic must in all respects be considered the same between partners and third persons, as with an individual merchant and the world.(e) The complainants, R. B. Jameson and S. M. Brown, in respect to their joint share in this ship, are to be considered as one and the same person, and, therefore, whatever act, lawful, or unlawful, hath been done by S. M, Brown, in respect to the ship, is to be considered as if he *67 were the sole owner of the share held by Jameson and himself in partnership. And if, by his fraud or misconduct, or that of the master, who was subject to and must be presumed to have acted under his immediate orders, as being present, and superintending the business of the ship, at Port-au-Prince, the ship with her cargo became forfeited and lost, under the laws of the country where she then was $ the partnership of Jameson and Brown became equally liable to Hadfield, for the loss of the cargo on board, as Brown himself, if sole owner of their part, could have been. And, upon the same principle, both, freighters and underwriters would be discharged, from all obligation to pay the freight that might otherwise have accrued, upon the completion of the voyage, and the insurance which would have been demandable if the ship had been lost by any of the risks contemplated in the policy. On the other hand, Brawn is not only answerable to his partner Jameson, but t© the other part owners of the ship, both for the freight and insurance, thus lost by’ his fraud and misconduct, if such be the fact.(a) And this upon the general principle in law, that, if one tenant in common of a personal chattel destroy the common property, he is liable to be sued by his companion for the loss.(b) Thus, where one part owner of a ship had forcibly taken it out of the possession of another, secreted it, and changed its name; and the ship afterwards came into possession of a third person, who sent it to Antigua, where it was sunk and lost, the chief justice, Lord King, left it to the jury to say, under all the circumstances of the case, whether this was not a destruction of the chip, by means of the defendant j and they finding it to be sc, the plaintiff recovered; and the court of common pleas, afterwards, approved of the direction. (c) Cut, if the loss of the ship were in fact ©wing to the misconduct of Moody alone, (the master spoken of by Watson?) the only difference would be, that, unless 'inch misconduct should amount to barratry, he would be *68 the person liable to repair the owners their damages sus» * • • tained in the loss of freight and insurance by his misconduct.(a) On these grounds, I differ from the hypothetical reasoning of the chancellor in his decree, wherein he says, “ That if Brown were responsible for the loss o£ *e ship, and the product of its cargo, he was privately responsible, so that the surviving partner was not bound to make reparation, unless he appear to be a debtor to Brown upon a settlement of their private accounts.”
Neither can I assent to his proposition, that, from the length of time ■ without any tidings of the ship, legally-attested, the presumption is sufficient evidence of the loss. There was not the smallest particle of foundation for presumption in this case. The complainant, Brown, was' himself with the ship when she was lost. If he were not the cause of that loss, as the defendant alleges, why did he not produce such proof of the loss (as undoubtedly was in his power) as might remove all doubts and conjectures on the subject ? Without proof of the loss he could not be entitled to recover the insurance; and without proof that the loss was occasioned by some event insured against, and within the scope of the policy, his right to recover would be precisely the same as without proof of the actual loss. Presumption of lossis only admitted on the ground of shipwreck, or other danger of seas; but never where the last tidings of the ship point to a more immediate cause of loss.(b) Equally unsound, in my opinion, is that part of the decree, which pronounces that freight was due when the ship arrived at Port-au-Prince, if thereby the chancellor meant (as he appears to have done) that, being payable monthly, if required, it could not be refused, if the voyage were afterwards defeated; or reclaimed, if paid monthly, according to stipulation. From the best consideration I have been able to give to the charter-party, it appears to me to be for one entire voyage: the proceeds of the cargo of flour, taken in at Philadelphia, were invested in *69 coffee at Port-au-Prince: what benefit could accrue, to the owner of the cargo, by the delivery of the flour at Port-au-Prince, if the proceeds thereof should be lost he-fore the ship arrived at her final port of discharge ? None whatever. The. profits, both of the shipowners and the owners of the cargo, were to depend upon the safe arrival of the ship at her port of discharge. And, although the freighter should have advanced the whole freight, for a year, or more, before the ship sailed from England, yet, if she were lost, I am of opinion that, upon this charter-party, it might be recovered back. Had I any doubt of this, upon principle, (which I have not,) the decision of Lord Ellenboiiougii, in Mashiter v. Buller (a) , , would remove ií.(b)
Withiespect to the insurance; the law appears to be settled that in all cases of actual fraud, on the part of the -assured, or his agent, the underwriter is not only not liable, but may retain the premium he has received j(c) nor can the insured recover any loss, which is not a dirent and immediate consequence of the peril insured against; (d) and, therefore, although an underwriter is liable for all damage arising to the owner of the ship, or goods, from the restraint or detention of princes, &c, (which are ordinarily acts of power or force,) yet that rule shall not be extended to cases, where the insured shall navigate against the laws of the country, in the ports of which he may chance to be detained, or to cases where there shall he a seizure for non-payment of customs.(e) Neither is the loss (according to the defence setup by the answer) attributable to the barratry of the master. For though barratry may be committed by the master of a ship smuggling on his own account, without the privity of the owners %(f) yet it appears, that if the act of the master be done with a view to the benefit of his owners, or with their privity or consent, and not to advance his own private interest, it is not barratry ; and, therefore, not within the terms of the policy, upon *70 that ground ¡(a) and, according to the words of Lord Mansfield, in the case of Vallejo v. Wheeler,(b) nothing is so clear as that, if the owner of a ship insure, and bring an action on the policy, he can never set up, as a crime, a thing done by his own direction and consent.' The same doctrine was recognised, and repeated, by the, same judge, in Nutt v. Bourdieu,(c) who said, “ Barratry *s something contrary to the duty of the master and mariners, the very terms of which imply that it must be in the relation in which they stand to the owners of the. ship. An owner of a ship cannot commit barratry. 'He may make himself liable by his fraudulent conduct to the owners of the goods, but not as for barratry. And besides, barratry cannot be committed against the owner with his consent; for though the owner may become liable for a civil loss, by the misbehaviour of the captain, if he consents, yet that is not barratry. Barratry must partake of something criminal, and must be committed against the owner, by the master, or mariners.” And it seems also clear, that if the owner be also the master of the ship, any act which in another master would be construed barratry, cannot be so in him ; because such doctrine would militate against an acknowledged rule in criminal law, that no man shall be allowed to derive a benefit from his own crime, which he would do, were he to recover against the insurer for a loss occasioned by his own act. (d)
The evidence of the seizure and condemnation of the ship, for a fraud on the revenue laws of St. Domingo, as annexed to the answer of the defendant, remains to be considered.
In the case of Young v. Gregory, (e) in which the district court reversed the judgment of the county court, because the latter admitted letters and depositions to go • in evidence to the jury to prove that an attachment had been levied on the plaintiffs property in a foreign country ; and because the attachment in the proceedings men *71 tioned, or an authenticated copy thereof, was the best evidence, and ought to have been produced; three of the judges of this court concurred in the opinion that the evidence was admissible, as it related to proceedings in a foreign country, which oftentimes can be proved in no other way than by depositions, and testimony dehors the proceedings ; of which it is not always in the power of the party to procure copies. The actual situation of the island of St. Domingo, during the last sixteen or seventeen years, is too generally known, to create much doubt of the applicability of the reasons, just mentioned, to the proceedings in that country. The history produced by Mr. Wirt cannot be doubted;(a) and the evidence arising from the certificate of attestation by Sir Adam Williamson, governor and commander in chief of the British possessions in Hispaniola, shows that the possession of the place, and the government thereof, had passed from the dominion of France to that of England, in the short period of eighteen months from the time of the alleged seizure and condemnation of the Favourite, at that place. The certificate is probably in the usual form adopted by the British governor, at that period; and it would be too much to say, it is not duly authenticated, or worthy of credit, because, under such circumstances, it is certified only under the governor’s seal at aims, instead of a colonial, or public seal. The revolutionary history of our own country shows, that, at a particular period, commissions of every kind, though by the constitution required to be made with the seal of the commonwealth annexed, were, of necessity, authorized to be granted, and declared efficacious and valid to all intents and purposes, without that symbol of the public authority.(b) I think, therefore, the certificate sufficiently authentic. Brown, being on the spot when the seizure and condemnation took place, migut, if so disposed, have obtained, I presume, a copy of the proeeed *72 ings, authenticated according to the ordinary forms of the French colonies. He having neglected to do so; or not choosing to produce it, if he had one, I think the court well warranted in considering this as the best evidence to be had in the cause.
The first document, in point of time, relative to the seizure of the ship, is contained in the copy of a letter addressed by S. M. Brown, calling himself owner of the ship, to the civil ordonnateur of St. Domingo, (an officer whose particular functions I am unacquainted with,) dated December 30, 1783; in which he endeavours to exculpate himself from any intention to commit a fraud. The condemnation of the ship does not appear to have taken place until the 16th of January following. Of the ordinary course of proceedings in such cases, we have no information, and cannot possibly form either a judgment, or conjecture.
The sentence of confiscation and condemnation was pronounced by commissioners, calling themselves “ The intermediary commission, exercising, provisionally, all the functions appertaining to colonial assemblies,” (of whose functions we have no information,) u being moreover the only administrative body of the colony, in virtue of legal powers granted to them by the delegates of the republic, having consequently the right of investigating frauds or infractions of law of any sort, and esteeming it their first .duty to administer impartial justice, without respect of persons; ” it proceeds to state the allegations of fraud, the evidence, and the penalty prescribed by law ; and concludes with declaring the confis.cation of the ship, together with all the merchandise on board; condemns the captain to the fine provided by a certain arrét; and directs the immediate execution of that sentence.
Were there nothing more in the record, it would be difficult to refuse to this intermediary commission, as it styles itself, the character of a judicial tribunal, or to, *73 disapprove of the sentence pronounced, upon the evidence therein seated. And yet, on the very same day th-.'t this sentence was ratified, after being read over and signed on the succeeding day to that on which it was first pronounced, we find the commission, after due deliberation, resolve to address a letter immediately to the civil commissary of the French republic, in which, speaking of their body, they say, “ The commission, not being a judiciary tribunal, where parties may plead their causes pro and con, but an administrative tribunal, which pronounces on the representation of the ordonnaieur, and a review of the documents, expect your orders, directing them how to act in this occurrence,” ike. After this, I fnd myself utterly at a loss in what light to consider this tribunal, and its proceedings. The reply of the civil commissioner leaves no room for any favourable construction either of the power and functions of the intermediary commission, or of its course of proceeding, as the means of administering impartial justice.
How, then, are this court to decide upon the question, as between the owners of the ship, and the affreighterr,, who are involved in the same common loss, and, apparently, upon the same common ground ; or, as between the assured and the underwriters ? I can only answer, that both were questions properly cognisable in a court of law, and not in a court of equity. The liability of the. freighters, to recover freight pro rata iiineris, or of the shipowners, to compensate them in damages for the loss of the cargo, through the fraud or misconduct of a part owner, or of the master, were questions exclusively proper for a court of law; as was the liability of the underwriters to pay, or not to pay, the insurance; and retain, or demand, the premium; according to circumstances. Why did the owners of the ship withdraw their insurance made in Baltimore, and direct an insurance to be made in EnglandP Certainly for some cogent *74 reasons. Were they not bound, according to the principles of universal law, to follow the person of the defendant, if still residing where the contract was made ? Why did they not ? Perhaps, because, according to the laws of the country, where both the charter-party and the insurance were made, there was something in the one or the other, which avoided the contract from, the beginning. Be that as it may, I think the plaintiffs were bound to establish their right, both to the freight and the insurance, before they could be entitled to a decree for either, in a court of equity here. Let it be remembered that, if Hddfteld actually caused an insurance to be made, (as lie alleges in his letter of the 2d August, 1793,) he could not be made liable to the owners of the ship for it, until a recovery against the underwriters ; and in an action against them, the owners would never have recovered, if the ship was lost by their own misconduct, or that of their agent. This was a question purely legal. If they seek to charge Iladfeld, as an underwriter, for having, in fact, neglected to make an insurance, notwithstanding his assertion to the contrary, the question whether he was guilty of such neglect, is also purely legal, and the recompense for it is wholly in damages; besides, in such an action, Had field would be entitled to the benefit of every defence which the underwriters, if the suit had been brought against them, could have made. So that his defence was doubly proper in a court of law. The law, which gives to a party a right to attach the property of another in the hands of his debtor in Virginia, certainly was not meant to draw the decision of all litigated questions, proper for the courts of law, in the country where the defendant resides, exclusively to decide, to the final and exclusive decision of our courts of equity. This very case furnishes the strongest reason against such a construction; for the bill contains not any proper allegation, and the *75 whole course of proceedings no evidence, sufficient for a court of equity to decide between tbe parties.
My opinion, therefore, is, that if the cause had been ripe for a decree in tbe county court, that court ought only to have retained it for a year, or such further period as might have been necessary, to give tbe plaintiffs an opportunity of prosecuting their action at law upon the charter-party, and policy of insurance, respectively ; and, in case they should establish their claim, against the defendant Hadfieid, to both, or either, and it should be made appear that the claim so established remained unsatisfied, then the court ought to have pronounced a decree for the amount of the same ; to be levied upon the effects attached in the hands of the other defendants, or paid by the security for performing the decree, as either course might be adapted to the nature of the case. And I am of opinion, that both decrees, be reversed with costs; and that the cause ought now to be remanded to the superior court of chancery, with directions to retain the same for a year, or such further .period as may be necessary for the same course to be now pursued by the parties, if they think proper. But, should this course not be approved of, I think the court of chancery ought to direct an issue or issues to be made up, with respect to all the material facts in the cause, and direct a trial thereof to be had by a jury of merchants ; and, if such jury shall be of opinion that the plaintiffs are entitled to recover any damages, that they assess the same, and that the verdict be returned, See.; or, (if the majority of the court are of a different opinion,) that the plaintiffs’ bill be dismissed without prejudice to any future action that he may be advised to bring upon the charter-party or policy of insurance. (1) In the view I have taken of this *76 cause, I have unavoidably pretermitted several import tant points, which would require much time to consi" der, and which I pass over only for that reason..

 Laws of Virginia edit. 1794, c. 78.

 2 Bro.Ch. Cas. 87, 88.

 Note by the Importer, bee t?:e case of Smith v. Jenny et al., 4 H. & M. 444. referring to that of M'Kim v. Fulton and others, (MS.) in which it was decided that an endorsement on the sulmeina, ny the clerk of the eourts (though without any previous order,) operated as sufficient notice, binding the home defendants net to part with .the debts or eilc-els, of the absent doiWulaniPj in their hands, wbhont ie-rve of f be court. See riso ibid, d'.d,

 Rev. Code, vol. 1. c. 67. 8. 44.

 1 Wash. 149.

 2 Wash. 42.

 Abbott on Shipping, 83. (marg.)

 Ibid. 123 (marg.)

 Watson on Partn. 45. 62. 95.

 1 Hen. Bl. 48. 2 W. Bl. 1000, 1001. Doug. 371.

 Watson, 154. 3 T. R. 454. Biggs v. Lawrence, Watson, 174, 175.

 1 Atk. 198, 199. Meymot’s Case.

 Watson, 229.

 Wetson 105.

 Co. Litt. 200.

 Watson., 61, 62.

 Abbott, 105. 123. 1 T. R. 252. Park on Ins. 84.

 2 Marsh. 418.

 1 Campb. Rep. 84.

 Abbott, 179 2. 285. 270.(marg.) S. P.

 Park on Ins. 213.

 Ibid. 56.

 2 Vern. 176. Park, 30.

. Lockyer v. Offley, 1 T. K. 252 Park on Ins. 31.

1173. (a) Park, 84. Coup.

 Cowp. 143

 1 T. R. 330.

 Park, 94. c. 5.

 3 Call, 446.

 Edwards's History of the West Indies.

 Laws of Virginia, October 1776, c 18. See Ch. Rev. p. 43.

 Jiiaij 25,1809. Judge Tucker submitted the following question to '‘he court* as proper to he argued by counsel* and considered the court, in she djscuEsiOE of this cause" iS Whclhpr. in eases of attachment against the *76 effects of absent defendants, if a question purely legal arise, upon a contract of charter-party, or policy of insurance, entered into in a foreign country, where the defendant still resides, and where the proper remedy is by an action sounding altogether in damages, it be proper for the court (in which the attachment is levied, or security is given to perform the decree) only to retain ihe cause, until, die complainant shall have liquidated his demand by a settlement, or esiablished the same by a judgment against the defendant in the country where he resides; or whether it be competent to the court, in which ihe attachment is levied, to proceed to the trial and determination of every such question, whether of law, or fact, and to ascertain the plaintiff’s damages, if entitled to any ? And, in the latter case, whether the trial ought to be had, according to the course, of proceeding in oourts of equity ; or whether the court ought to direct an issue to be made up at law, and a trial thereof to be had by a jury for that purpose to be empannelled !’J
Judges Roane and Fleming took time to consider this proposition,; but j;ave no opinion upon it.